# Presidential Determination Allowing Financial Assistance to Tibet

President Carter's 1980 Determination that financial assistance to the People's Republic of China would be in the national interest satisfies the requirements of section 2(b)(2) of the Export-Import Bank Act of 1945 and thus permits the Export-Import Bank to provide assistance to the region of Tibet, its provincial government, and its residents without any presidential action in addition to the prior determination made with respect to China.

November 6, 1998

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
EXPORT-IMPORT BANK

You have sought our advice regarding whether the Export-Import Bank may provide financial assistance to Tibetan entities in light of section 2(b)(2) of the Export-Import Bank Act of 1945 ("Act"), 12 U.S.C. § 635(b)(2) (1994). That section prohibits the Export-Import Bank ("Bank") from providing either direct or indirect financial assistance to a "Marxist-Leninist country, or agency or national thereof" and lists separately as such countries both the "People's Republic of China" ("China") and "Tibet." *Id.* The prohibition may be waived, however, whenever the President determines that assistance to a particular country would be in the national interest. *Id.* In 1980, President Carter made such a determination for assistance to China. *See* Pres. Determination No. 80–15, 45 Fed. Reg. 26,017 (1980) ("1980 Determination"). At that time, as now, the executive branch considered Tibet to be part of China.

Your inquiry raises the question whether a separate national interest determination needs to be made with respect to Tibet. We conclude that President Carter's 1980 Determination with regard to China satisfies the requirements of section 2(b)(2) with respect to both China and the region of Tibet and thus permits the Bank to provide direct or indirect assistance to the region of Tibet, its provincial government, and its residents.

## I.

Section 2(b)(2) provides, in relevant part:

> The Bank in the exercise of its functions shall not guarantee, insure, extend credit, or participate in the extension of credit—(i) in connection with the purchase or lease of any product by a Marxist-Leninist country, or agency or national thereof; or (ii) in connection with the purchase or lease of any product by any other foreign country, or agency or national thereof, if the product to be pur-

244

chased or leased by such other country, agency, or national is, to the knowledge of the Bank, principally for use in, or sale or lease to, a Marxist-Leninist country.

12 U.S.C. § 635(b)(2)(A). The section defines "Marxist-Leninist country" as "any country that maintains a centrally planned economy based on the principles of Marxism-Leninism, or is economically and militarily dependent on any other such country" and separately lists China and Tibet as two such countries. *Id.* § 635(b)(2)(B)(ii). The prohibition may be waived if the President determines either that "any country on the list . . . has ceased to be a Marxist-Leninist country," *id.* § 635(b)(2)(C), or that "guarantees, insurance, or extensions of credit by the Bank to a [Marxist-Leninist] country, agency or national . . . are in the national interest," *id.* § 635(b)(2)(D). A separate national interest determination must be made for each transaction for which the Bank would extend a loan in an amount equal to or in excess of $50 million. *Id.* All determinations must be reported to Congress. *Id.*

Pursuant to section 2(b)(2) of the Act, on April 2, 1980, President Carter determined that "it is in the national interest for the [Bank] to guarantee, insure, extend credit and participate in the extension of credit in connection with the purchase or lease of any product or service by, for use in, or for sale or lease to, the People's Republic of China." 1980 Determination.[1] The 1980 Determination continues in effect today for financial assistance to China other than loans of $50 million or more. When the Act was amended in 1986, the Conference Report explained that no new national interest determination would be needed for any country for which a general national interest determination had already been made. *See* H.R. Conf. Rep. No. 99–956, at 5 (1986) (Joint Explanatory Statement of the Committee of Conference), *reprinted in* 1986 U.S.C.C.A.N. 2472, 2473.

At the time President Carter made the 1980 Determination with respect to China, the official position of the executive branch was that Tibet is part of China. *See* Memorandum for Caroline Krass, Attorney-Adviser, Office of Legal Counsel, from Mary Comfort, Attorney-Adviser, Office of the Legal Adviser, Department of State (Oct. 16, 1998) ("State Memorandum"). In view of this underlying understanding, when President Carter determined that it was in the national interest

---

[1] Subsequent to the 1980 Determination, Presidents have repeatedly determined that it is in the national interest for the Bank to provide loans in excess of $50 million to China with regard to various projects. *See, e g.*, Pres. Determination No. 81–12, 46 Fed. Reg. 45,927 (1981), Pres Determination 82–19, 47 Fed. Reg. 39,655 (1982); Pres Determination 88–11, 53 Fed Reg. 9423 (1988), Pres. Determination 88–25, 53 Fed Reg. 40,013 (1988); Pres Determination 96–37, 61 Fed Reg. 36,989 (1996), Pres. Determination 96–38, 61 Fed. Reg 36,991 (1996), Pres Determination 97–2, 61 Fed. Reg 59,805 (1996), Pres Determination 97–3, 61 Fed. Reg 59,807 (1996); Pres Determination 97–36, 62 Fed Reg 52,475 (1997) No President has issued a specific national interest determination for Tibet under section 2(b)(2), and any assistance from the Bank to the region of Tibet, its provincial government, or its residents in the form of a loan equal to or in excess of $50 million would require a new presidential determination under section 2(b)(2) *See* 12 U S C § 635(b)(2)(D)(ii).

for the Bank to provide assistance to China, he thereby determined that it was in the national interest for the Bank to provide assistance to Tibet.[2]

## II.

Section 2(b)(2) clearly requires that, before the Bank may grant direct or indirect assistance to Tibet, its provincial government, or its residents, the President must make a determination either that such assistance is in the national interest, or that Tibet "has ceased to be a Marxist-Leninist country." 12 U.S.C. § 635(b)(2)(C), (D). As noted above, in 1980 President Carter made a national interest determination with respect to China, and at that time and since then, the United States has recognized China to include Tibet. *See* State Memorandum. In light of this history, we must consider whether President Carter's 1980 Determination is adequate to satisfy the requirements of section 2(b)(2) or whether Congress has required a separate Presidential determination regarding Tibet.

At the outset, we note that, particularly when considered in light of the relevant factual background, the statutory reference to the "Marxist-Leninist country" of Tibet is unclear. At the time of the 1980 Determination, as now, the official position of the executive branch was that there is no "country" of Tibet because the boundaries of China include Tibet. *See* State Memorandum. In addition, as a matter of actual governance, Tibet was and continues to be part of China. *See id.* "Tibetans hold Chinese passports, are represented in the National People's Congress (the national legislative body of China), and in every other respect are subject to Chinese rule." *Id.* Moreover, to the extent that some might argue that Tibet qualifies as an independent politically-defined "country," the argument presumably also would be that the leadership of that country would consist of the Dalai Lama and his supporters. To our knowledge, however, the Dalai Lama

---

[2] Subsequent to the 1980 Determination, the executive branch has consistently embraced the position that Tibet is part of China, rather than an independent foreign state *See* The President's News Conference with President Jiang Zemin of China in Beijing, 1 Pub Papers of William J Clinton 1069, 1075 (1998) (expressing President Clinton's "agree[ment] that Tibet is a part of China, an autonomous region of China"), The President's News Conference with President Jiang Zemin of China, 2 Pub Papers of William J Clinton 1445, 1452 (1997) (expressing United States commitment that there will be "no attempt to sever Tibet from China"), Department of State, 105th Cong , *Country Reports on Human Rights Practices for 1996*, at 640 (Joint Comm Print 1997) ("The United States recognizes the Tibet Autonomous Region        to be part of the People's Republic of China "), *Human Rights in Tibet· Hearing Before the Subcomms on Human Rights and International Organizations, and on Asian and Pacific Affairs of the House Comm. on Foreign Affairs*, 100th Cong 33 (1987) (statement of Ambassador J Stapleton Roy, Deputy Assistant Secretary of State) ("[T]he United States Government considers Tibet to be a part of China and does not in any way recognize the Tibetan government in exile that the Dalai Lama claims to head "); Statement on Signing the Export-Import Bank Act Amendments of 1986, 2 Pub Papers of Ronald Reagan 1390, 1391 (1986) ("1986 Signing Statement") ("The United States recognizes Tibet as part of the People's Republic of China ")

Congress, however, has at times expressed a different perspective. *See* Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Pub L No 103–236, § 536, 108 Stat. 382, 481 (1994) ("Because Congress has determined that Tibet is an occupied sovereign country under international law," Congress has imposed a reporting requirement on the Secretary of State regarding, *inter alia*, the state of relations between the United States and "those recognized by Congress as the true representatives of the Tibetan people "), *see also* Foreign Relations Authorization Act, Fiscal Years 1992 and 1993, Pub L No 102–138, § 355, 105 Stat 647, 713 (1991) ("It is the sense of the Congress that  .   Tibet      is an occupied country under the established principles of international law [and] Tibet's true representatives are the Dalai Lama and the Tibetan Government in exile as recognized by the Tibetan people . . . .")

and his supporters have never espoused Marxist-Leninist principles. *Id.* These countervailing concerns—indicating, on one hand, that Tibet is not a polity and, on the other, that if it were regarded as a polity it would not be Marxist-Leninist polity—make it difficult to interpret what the reference to the "Marxist-Leninist country" of Tibet means.

One possible reading that could be offered to resolve this problem is that Congress intended the term "country" in section 2(b)(2) to refer, not to polities, but to particular geographically-defined regions of the world, of which Tibet is one. If this were the best reading of the statute, a separate presidential determination would be necessary before financial assistance could be provided to the region of Tibet. We believe, however, that this reading of the provision is at odds with the statutory text and cannot be accepted. Section 2(b)(2) defines the term "Marxist-Leninist country" to mean "any country that maintains a centrally planned economy based on the principles of Marxism-Leninism, or is economically and militarily dependent on any other such country." 12 U.S.C. § 635(b)(2)(B)(i), (ii). This definition seems more consistent with a notion of politically-defined nations than geographically-defined regions. Only a polity, not a region, "maintains a centrally planned economy based on the principles of Marxism-Leninism." *Id.* The prohibition in section 2(b)(2) on assistance to any "national" of a Marxist-Leninist country also supports this interpretation. The term "national" indicates a political relationship with, and an obligation of permanent allegiance to, a nation. *See* Webster's Third New International Dictionary 1505 (1986) (defining "national" as "one that owes permanent allegiance to a nation without regard to place of residence or to possession of a more formal status (as that of citizen or subject)").

Textual analysis, then, indicates that the word "country" is best read to mean "polity." Given this reading of "country," interpreting section 2(b)(2) to require the issuance of a separate national interest determination for Tibet would raise the issue of the President's recognition power, which derives from the President's textually-committed powers to appoint ambassadors and to receive ambassadors and other public ministers. U.S. Const. art. II, §§ 2, 3; *see also Can v. United States,* 14 F.3d 160, 163 (2d Cir. 1994) ("President's power to recognize foreign governments is implicit in Sections 2 and 3 of Article II"). The President's recognition power is exclusive. *See Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 410 (1964) ("Political recognition is exclusively a function of the Executive."); *Goldwater v. Carter,* 444 U.S. 996, 1007 (1979) (Brennan, J., dissenting) ("Our cases firmly establish that the Constitution commits to the President alone the power to recognize, and withdraw recognition from, foreign regimes."). It includes both the authority to recognize and the authority to refuse recognition to a foreign state or government. *See The Maret,* 145 F.2d 431, 442 (3d Cir. 1944) (President's recognition power includes authority to adopt a policy of non-recognition of a foreign sovereign); Restatement (Third) of the Foreign Relations

Law of the United States § 204 (1987) ("[T]he President has exclusive authority to recognize or not to recognize a foreign state or government, and to maintain or not to maintain diplomatic relations with a foreign government."); *cf. Autocephalous Greek-Orthodox Church of Cyprus v. Goldberg and Feldman Fine Arts*, 917 F.2d 278, 292–93 (7th Cir. 1990) (refusing to give effect to confiscatory decrees by the Turkish Federated State of Cyprus ("TFSC") because the TFSC was not recognized by the United States government).

The President's recognition power includes the authority to determine what territory the United States government will consider to fall within the sovereignty of a foreign government. *See Williams v. The Suffolk Ins. Co.*, 38 U.S. 415 (1839) (purely an executive decision to determine whether the Falkland Islands were subject to the jurisdiction of the "government of Buenos Aires"); *Bill to Relocate United States Embassy from Tel Aviv to Jerusalem*, 19 Op. O.L.C. 123 (1995) (to the extent that a bill sought to compel the President to recognize explicitly that Jerusalem was under Israel's sovereignty, it was inconsistent with the President's exclusive recognition power); *see also Constitutionality of Legislative Provision Regarding ABM Treaty*, 20 Op. O.L.C. 246, 251–52 (1996) (as part of the recognition power, President has sole authority to determine which states are the "successors" to a state, like the Soviet Union, that has been completely dissolved); *but cf. Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 380 (1948) (citing *Jones v. United States*, 137 U.S. 202 (1890) for the proposition that "the determination of sovereignty over an area is for the legislative and executive departments"). Congress thus clearly may not require the President to recognize Tibet as a sovereign government or, conversely, to recognize the borders of China so as to exclude Tibet. That is not to say that Congress could not, under any circumstances, require the President to make a determination with respect to the *region* of Tibet that is more specific than the 1980 Determination prior to making funds available to that region. But where Congress has not clearly done so— and, indeed, where, as here, there exists contrary textual evidence indicating that determinations were to be made concerning nations, not regions—we will not assume that Congress intended to so constrain the President in an area in which he exercises such great discretion.

Moreover, when Congress initially listed China and Tibet separately for purposes of section 2(b)(2), the position of the United States regarding the status of China and Tibet was not clear. As originally enacted, section 2(b)(2) codified a provision that had been inserted in the Bank's appropriations since 1964 that prohibited assistance to any "Communist country (as defined in section 620(f) of the Foreign Assistance Act of 1961, as amended)." Export-Import Bank Act Amendments of 1968, Pub. L. No. 90–267, § 1(c), 82 Stat. 47, 48; *see also Export-Import Bank Act—Procedure for Transactions with Communist Countries*, 42 Op. Att'y Gen. 479 (1974). Section 620(f) has separately listed the People's Republic of China and Tibet as "Communist countr[ies]" since the Foreign Assistance Act

("FAA") was amended in 1962. *See* Foreign Assistance Act of 1962, Pub. L. No. 87–565, § 301(d)(3), 76 Stat. 255, 261. We note, however, that when section 2(b)(2) was originally enacted in 1968, the United States government did not recognize the People's Republic of China as an independent country. In addition, the United States government's position on Tibet's status was "ambiguous." State Memorandum. A State Department spokesman stated at a press conference in 1959:

> [T]he historic position of the United States has been that Tibet is an autonomous country under Chinese suzerainty.[3] However, the United States Government has consistently held that the autonomy of Tibet should not be impaired by force. The United States has never recognized the pretensions to sovereignty over Tibet put forward by the Chinese Communist regime.

Transcript of Press and Radio News Conference (Sept. 11, 1959), *reprinted in* 1 Marjorie M. Whiteman, *Digest of International Law* 464 (1963);[4] *see also* Letter from Assistant Secretary of State Morton to Senator Wiley (Apr. 29, 1953), Whiteman, at 463–64; State Memorandum. Thus, in light of the ambiguity regarding the status of both the People's Republic of China and Tibet when section 2(b)(2) was enacted, we do not believe that Congress's separate listing of the two was an attempt to take the extraordinary step of forcing the President to recognize each as an independent, sovereign nation as a precondition for granting Export-Import Bank assistance.

When Congress amended section 2(b)(2) in 1986 to replace the cross-reference to section 620(f) of the FAA with a list of "Marxist-Leninist countries," it continued to list the People's Republic of China and Tibet separately. *See* Export-Import Bank Act Amendments of 1986, Pub. L. No. 99–472, § 8, 100 Stat. 1200, 1201. At that time, President Ronald Reagan objected to the separate listing of Tibet, explaining that, "The United States recognizes Tibet as part of the People's Republic of China. I interpret Tibet's inclusion as a separate country to be a technical oversight." *See* 1986 Signing Statement at 1391. Nonetheless, in 1992 Congress again listed the People's Republic of China and Tibet separately when it amended section 2(b)(2) to reduce the list of thirty "Marxist-Leninist countries" to nine. *See* Export Enhancement Act of 1992, Pub. L. No. 102–429, 106 Stat. 2186, 2194. The continuation of the separate listing in 1986 and 1992, after the United States government had recognized the People's Republic of China and in

---

[3] "Suzerainty" is defined as "the dominion, authority, or relation of a suzerain with regard to the subject person or state, esp[ecially] in the matter of control over the foreign affairs of such a state." Webster's Third New International Dictionary 2304–05 (1986) A "suzerain" is "a dominant state exercising varying degrees of control over a vassal state with regard to its foreign relations but allowing it sovereign authority in its internal affairs." *Id.* at 2304.

[4] China invaded Tibet in 1950

the face of an executive branch policy that clearly recognized Tibet as a part of that country, raises the question whether, although the 1980 Determination covered the region of Tibet, these subsequent legislative changes have rendered that determination inadequate as to Tibet. We believe that the mere retention of the separate listing without a clearly articulated statutory purpose is insufficient to change the scope or effect of the 1980 Determination. Indeed, the 1986 Conference Report's explicit affirmation of the continuing validity of then-existing determinations strongly supports the view that Congress was not attempting to alter the consequences of pre-1986 determinations. The Report concluded, "Since the existing waiver authority is retained, for any country for which a general national interest determination has already been made prior to enactment of this bill, the legislation would not require the making of a new general national interest determination." H.R. Conf. Rep. No. 99–956, at 5, *reprinted in* 1986 U.S.C.C.A.N. 2472, 2473.[5]

In sum, it is our view that the 1980 Determination satisfies the requirements of section 2(b)(2) with respect to Tibet. We thus conclude that the Bank may provide direct or indirect assistance to the region of Tibet, the provincial government of Tibet, or Tibetan residents, other than loans equal to or in excess of $50 million, without any presidential action in addition to the prior determination made with respect to China.

RANDOLPH D. MOSS
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[5] The same Congress that passed the 1992 amendment listing the People's Republic of China and Tibet separately despite President Reagan's 1986 statement that Tibet is part of the People's Republic of China, *see* Export Enhancement Act of 1992, Pub. L No 102–429, 106 Stat. 2186, 2194, expressed its view in unrelated legislation that Tibet is "an occupied country under the established principles of international law [and] Tibet's true representatives are the Dalai Lama and the Tibetan Government in exile as recognized by the Tibetan people." *See* Foreign Relations Authorization Act, Fiscal Years 1992 and 1993, Pub L No 102–138, §355, 105 Stat 647, 713 (1991). While it is clear that Congress would like the President to recognize Tibet, that does not mean that the 1992 amendment to section 2(b)(2) was intended to require the President to make a new national interest determination specific to Tibet, especially since that would mean that, in the absence of such a determination, Tibet and its people currently would be ineligible for financial assistance from the Bank